Regardless of whether a petition sets out a cause of action, if the plaintiff proves every fact charged, without at the same time disproving his right to recover by establishing the existence of other undisputed facts which show that he is not entitled to a verdict, it is not proper to award a nonsuit. On application of this rule of practice to the facts of the present record, the grant of a nonsuit was error.
 No. 15005. NOVEMBER 21, 1944.
This case originated by Davis filing a suit to enjoin Otha Waddell, acting for W. P. Brown Sons Lumber Company, from trespassing and cutting certain timber on land lot No. 209, in Floyd County, Georgia. Otha Waddell and the lumber company filed an answer, in which it was admitted that Waddell was acting for the company, and that he had entered upon said lot, had placed a sawmill thereon, was proceeding to cut the timber, had already cut some, and was threatening to cut the remainder. Other allegations of the petition were denied. Further answering, the defendants said that at that time they were not on land lot No. 209, but were cutting timber on lot 224, which was owned by R. L. Holland and G. S. Holland, and that they had a deed to the timber from the Hollands; but that if they were on lot 209, they had a perfect right to be there under a timber deed executed by the plaintiff, dated July 3, 1940, and duly recorded in the records of Floyd County.
Thereafter, the plaintiff amended his petition by alleging that the damage was irreparable, that the trespass was a continuous one, and would continue from day to day unless the defendants were restrained and enjoined. He further amended, and in reference to the allegation that he had conveyed all the timber on lot No. 209, admitted that he did sign and execute such a deed, but *Page 487 
said that it was executed by him and accepted by W. P. Brown 
Sons Lumber Company through a mutual mistake of the parties as to the location of the south line of said lot No. 209; that, on the same day as the execution of the timber deed, he had bought this property, and had made no survey or measurement of it, but believed that a wire fence located on it was the south side of said lot, the same being in woods and with no cultivation on the north or south thereof, nor other sign or mark to indicate or show the south line; that he was approached by the lumber company to sell them the timber located on the lot, and, in consequence thereof and for the purpose of determining the amount of lumber located thereon and its value, he, together with a Mr. Barnes and a Mr. Gray, representatives and agents of the lumber company, went on the lot and into the woods for the purpose of seeing the timber and the lines; that at that time it was pointed out and agreed by the parties that the fence was on the south line, and that the lumber company was buying only the timber north of said fence; that the price agreed upon between the parties was in contemplation of the fence being the south line, and it was so understood and agreed upon by all concerned; that all of the plaintiff's dealings were with the said Barnes and Gray as representatives of the lumber company and with no others; that both the plaintiff and the lumber company in good faith believed that said fence was in truth and in fact the south line of the lot, and under that belief he executed and delivered to the lumber company said timber deed.
The plaintiff further alleged that thereafter the lumber company moved a sawmill on said lot north of the fence, and cut and sawed all of the timber contemplated in said timber deed, cutting none south of said fence, and removed its mill and ceased its operation there, stating that it had cut all of the timber bought by it; that it never started cutting south of said fence until approximately one year later, and has never contended, and does not now contend, that it is cutting the timber south of the fence by virtue of any right under said deed, but contends that said fence is the south boundary line of said lot No. 209, and that it has a timber deed to lot No. 224, and that the timber it is cutting is located on lot No. 224.
The plaintiff also alleged that subsequently to the execution of the timber deed by him, he found out that he was mistaken as to *Page 488 
the location of the south line of the lot, and that said fence was not on said line by some 1100 feet south thereof; and that he seeks to enjoin the defendant from cutting on said lot 209 south of said fence and north of the original and true line. He prayed that his deed to W. P. Brown Sons Lumber Company be reformed to show and reflect the true intent and purpose of the parties; and that the south line of the land so conveyed by said deed, that is, the fence across said lot, be said south line, so that the deed so reformed shall convey so much of said lot 209 as lies north of the wire fence running east and west across said lot. The defendant filed a demurrer to the petition as amended, which, after a hearing, was overruled.
On the trial, the plaintiff testified in part as follows: "On the same day I bought this property from Mr. Barry Wright I sold the timber on two of these lots to the Brown Lumber Company. . . I traded with Mr. Gray and a Mr. Barnes with the Brown Lumber Company, as their representatives. . . I had no dealings with anybody else connected with the Brown Lumber Company. I did go with Mr. Gray and Mr. Barnes out over the timber when I sold it to them, and that is where we traded for it, and they more or less made an estimate as to the amount of timber there. As to whether or not out there in the woods there was an old wire fence, well, yes, sir, there was, practically all around a portion of it. At the time I bought that property from Barry Wright, I thought that wire fence was the south line of my property. I had never had any survey made of this property before I bought it from Mr. Wright. . . At the time I was going over this timber with Mr. Barnes and Mr. Gray, I pointed out that fence to them, thinking that was the south line of the timber I was selling to them, and I sold the timber to them on the basis that that was the line. Following that, they moved their sawmill in there and cut the timber down to the wire fence and stopped there and moved their sawmill and equipment away from there. As to whether or not I ever had a conversation with either Mr. Barnes or Mr. Gray after they had cut the timber down to the fence, well, yes, sir, I did with Mr. Barnes. I had given them a contract to go in there and cut it; and when they had cut it out, I wanted to sell the place or use it anyway that I could, and I wanted to get that lease out, and Mr. Barnes told me that they *Page 489 
had cut all that they had bought, and told me that he could not give me a release himself, but that he would send to headquarters and get it for me at once. As to how long after that it was when they commenced cutting south of this fence, well, I don't know, it must have been a year."
A. H. Davis, the plaintiff's son, testified: "Mr. Gray, who is the timber cruiser for Brown Lumber Company, came to my house to get me to come up there to go with him to look at this particular timber, and I did, and we went over it, and we went to this fence that runs east and west through it, and we took that for the south line of the timber, and we went over it, and he asked me how much timber I thought was on it and I told him, and he said we are not very far apart, and he never did say what he thought, and I never asked him particularly about it; and then later, after they had cut this timber down to this fence, I was back up there to look at this timber south of the fence, and Brown Lumber Company at that time had done cut this timber that we had gone over at the time I was there with Mr. Gray, and they had already moved their sawmills, and my father got me to go over to Mr. Barnes's, who is the manager of Brown Lumber Company, to see if he would give him a release on this timber so he could sell it or work up the tops, or something like that, and Mr. Barnes said he could not do that until he went and looked at it himself, but that he understood they had cut all the timber that they had bought, and he was satisfied with that. I was talking to him about the timber south of it, and he said if my father had any more timber there they would want to buy it."
A surveyor testified that he made a survey at the request of the plaintiff; that he started at the northwest corner of lot 173, where there were trees marked, showing the corner of a lot. According to his testimony, the south line of lot 209 was far to the south of the old wire fence referred to in the petition and in the testimony of the plaintiff and his son as being the fence south of which no timber was sold to the defendants.
At the conclusion of the plaintiff's evidence, the defendants moved for a nonsuit, which was granted, and the plaintiff excepted.
The sole assignment of error challenges the *Page 490 
correctness of the judgment granting a nonsuit. The suit as amended was one seeking to enjoin the defendants from further entering upon and cutting timber on lot of land No. 209 in Floyd County. By amendment, reformation was sought of a deed from the plaintiff conveying the timber on lot No. 209 to the defendant lumber company. It was alleged that on the day when the plaintiff purchased this land, he, believing that a certain wire fence was on the south line thereof, and desiring to sell the timber, went on the land with the lumber company's agents, showed them the timber lying north of the fence, and agreed with them upon a price therefor; that all parties concerned contemplated the fence as the line, it being at the time so understood and agreed upon by and between them; that in good faith believing said fence to be in fact the south line of said lot, he executed to the defendant lumber company a deed covering the entire lot; that, subsequently thereto, he ascertained that he was mistaken as to the location of the south line of said lot, and that the correct south line was approximately 1100 feet south of said fence; that the defendants, after having cut and sawed all the timber on said lot north of said fence, removed the mill and ceased operating thereon; but that they are now cutting the timber, consisting of a considerable amount, which is located on this lot south of said fence. The defendants in their answer admitted that the plaintiff had title to lot 309, and also admitted that they had placed a sawmill on the lot and were proceeding to cut the timber remaining thereon.
The plaintiff introduced testimony supporting the allegations of his petition as to the mistake in supposing that the fence was the south line of the lot, and that, at the time the sale of the timber to the defendant lumber company was being negotiated, he pointed out the fence to its agents as being the line, and sold the timber to the lumber company on that basis; that the only timber he showed them and all that was agreed upon was that located north of the fence. It was further shown by the plaintiff's evidence that months before the petition was filed, the defendant lumber company cut and removed the timber north of the fence. Therefore the defendants' admission in their answer that they had placed a sawmill on said lot and were proceeding to cut the timber thereon, had cut some, and were threatening to cut the balance, could mean nothing else than that they (the defendants) were cutting and threatening to cut the timber on that part of the lot lying south *Page 491 
of the fence. Thus it appeared that the only material point at issue under the pleadings was, whether or not there had been a mutual mistake in describing the extent of the timber sold. As to this, the testimony in behalf of the plaintiff supported the allegations of his petition. The case therefore falls within the rule that it is not proper to award a nonsuit if the plaintiff submits evidence which prima facie proves every material fact charged, without at the same time disproving his right to recover by establishing the existence of other undisputed facts which show that he is not entitled to a verdict. Clark v. Bandy,196 Ga. 546 (27 S.E.2d 17).
Judgment reversed. All the Justices concur.